IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. _____ |
| BIG STAR GATHERING LTD L.L.P., F&M TRANSPORTATION, INC., JAMES JENSEN, JOPLIN ENERGY, LLC, F/K/A HUTCHISON HAYES ENERGY, LLC, JEFF KIRBY, PLAINS ALL-AMERICAN PIPELINE, L.P., SEMCRUDE, L.P., SAINT JAMES OIL, INC., SUPERIOR CRUDE GATHERING, INC., TRANSMONTAIGNE PARTNERS, L.P., WESTERN REFINING COMPANY, L.P., | § § § § § § § § § § § § § § § | JURY TRIAL REQUESTED |
| *Defendants*. | § § § | |

## PEP'S ORIGINAL COMPLAINT

PEMEX Exploración y Producción ("PEP") complains of the Defendants identified above as follows:

### I.   NATURE OF THE CASE

1.     This lawsuit addresses the trade in the United States of natural gas condensate stolen in Mexico. Natural gas condensate (or simply "condensate") is a mixture of hydrocarbon liquids that is produced with natural gas. Condensate is generally transported in liquid form and used as feedstock for refineries and petrochemical plants. Because condensate often contains few contaminants and is

easily refined into high-value oil products, it generally competes directly with light crude oil in downstream oil markets.

2.      The condensate at issue in this lawsuit is the sovereign property of the United Mexican States ("Mexico"). It was stolen in Mexico and then transported into and ultimately sold to large end-users in the United States. This lawsuit is directed at some of the individuals and entities who traded in the stolen condensate within the United States prior to the filing of this lawsuit.

3.      Some of the Defendants knew, or at least should have known, they were trading in or transporting, stolen condensate. Others were ignorant that they were purchasing stolen goods. In either case, however, the Defendants took possession of Mexico's sovereign property without right or title. All Defendants are therefore liable for their individual usurpation of Mexico's patrimony.

4.      The Defendants who knowingly trafficked in stolen condensate are more broadly liable for the entire scope of the US conspiracy to market the stolen condensate, a market that reaches into the hundreds of millions of dollars.

## II.      JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction because the controversy is between a foreign state as defined in 28 U.S.C. § 1603(a)—PEP—and citizens of different States, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. 28 U.S.C. § 1332 (a)(4).

6.      Venue is proper in the Southern District of Texas because Defendants Big Star, F&M Transportation, Hutchinson Hayes, Kirby, and Plains All-American Pipeline reside in the Southern District of Texas and a substantial part of the events and transactions giving rise to the controversy and the harms complained of occurred in the Southern District of Texas, as required by 28 U.S.C. § 1391.

## III.   PARTIES

7.     PEP is a decentralized agency of the Mexican government. PEP is headquartered in, and has its principal place of business in, Mexico City, Mexico. PEP has a separate juridical nature and existence from Petróleos Mexicanos (commonly known as "Pemex") and from other agencies and instrumentalities of the Mexican government. PEP brings this lawsuit without waiver of its or Mexico's sovereign immunity, except as expressly stated under United States and Mexican law.

8.     Big Star Gathering LTD L.L.P. ("Big Star") is an expired Texas limited liability partnership with its principal place of business in George West, Texas, and is a fully-owned subsidiary of Saint James Oil, Inc., a Nevada corporation, with its principal place of business in Sandy, Utah ("St. James"). "Big Star" includes Big Star, St. James, and Jensen. Big Star may be served with process by serving its registered agent James Jensen at 11177 Eagle View Drive, Sandy, Utah 84092.

9.     F&M Transportation, Inc. ("F&M") is a Texas corporation with its principal place of business in Edinburg, Texas. F&M may be served with process by serving its registered agent Frank Del Angel at 610 E. Monte Cristo Rd., Edinburg, Texas 78541.

10.    James Jensen ("Jensen") is a Utah citizen who lives in Sandy, Utah. At all times relevant to Plaintiff PEP's claims, Jensen served as, and acted within the scope of his employment as, president of Defendants Big Star and St. James. Jensen is also included in the term "Big Star." Jensen may be served with process at 11177 Eagle View Drive, Sandy, Utah 84092.

11.    Joplin Energy, LLC, formally known as Hutchison Hayes Energy, LLC (collectively, "Hutchison Hayes"), is a Texas limited liability company with its principal place of business in Baytown, Texas. Hutchison Hayes may be served with

process by serving its registered agent Randolph Ewing at 6363 Woodway Drive Suite 1000, Houston, Texas 77057.

12.     Jeff Kirby ("Kirby") is a Texas citizen who resides in Corpus Christi, Texas. At all times relevant to Plaintiff PEP's claims, Kirby served and acted within the scope of his employment as president of Defendant Superior. Kirby may be served with process at 600 Leopard Street Suite 2100-W, Corpus Christi, Texas 78401.

13.     Plains All-American Pipeline, L.P. ("Plains") is a Delaware limited partnership with its principal place of business in Houston, Texas. Plains may be served with process by serving its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 East 7th Street Suite 620, Austin, Texas 78701-3218.

14.     SemCrude, L.P. ("SemCrude") is a Delaware limited partnership with its principal place of business in Oklahoma City, Oklahoma. SemCrude may be served with process by serving its registered agent The Corporation Company at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

15.     Saint James Oil, Inc. ("St. James") is a Nevada corporation with its principal place of business in Sandy, Utah. St. James is also included in the term "Big Star." St. James may be served with process by serving its registered agent Wilson Barrows & Salyer at 442 Court Street, Elko, Nevada 89801.

16.     Superior Crude Gathering, Inc. ("Superior Crude") is a Texas corporation with its principal place of business in Corpus Christi, Texas. "Superior" includes Superior Crude and Kirby. Superior may be served with process by serving its registered agent Jeff Kirby at 600 Leopard Street Suite 2100-W, Corpus Christi, Texas 78401.

17.     TransMontaigne Partners, L.P. ("TransMontaigne") is a Delaware limited partnership with its principal place of business in Denver, Colorado.

TransMontaigne may be served with process by serving its registered agent The Corporation Company at 1675 Broadway, Suite 1200, Denver, Colorado 80202.

18.     Western Refining Company, L.P. ("Western Refining") is a Delaware limited partnership with its principal place of business in El Paso, Texas. Western Refining may be served with process by serving its registered agent CT Corporation System at 350 North St. Paul Street Suite 2900, Dallas, Texas 75201-4234.

## IV.   FACTUAL BACKGROUND

### A. Mexico's Patrimony and the Role of Pemex, PEP, and PMI

19.     Pursuant to the Mexican Constitution, Mexico's hydrocarbon resources are sovereign patrimony. Accordingly, the Mexican Constitution requires that any exploitation of Mexico's hydrocarbon resources be conducted by the State. CONSTITUTION OF THE UNITED MEXICAN STATES, Art. 27.

20.     Mexico's sovereign ownership of these resources is "*inalienable e imprescriptible*." *Id*. at par. 6. According to this provision, Mexico cannot lose its sovereign ownership and rights over Mexico's hydrocarbons by adverse possession or the passage of time, and Mexico's hydrocarbons cannot be traded as a commercial product.

21.     In 1938, Pemex was created by Presidential decree to fulfill the mandate of the Mexican Constitution that the Nation shall exclusively carry out the exploitation Mexico's hydrocarbon resources. Today, Pemex is the 11th largest oil enterprise in the world and one of the largest enterprises in Mexico and Latin America. Pemex operates through four subsidiary operating entities, including PEP. Pemex' subsidiaries have a separate legal identity from Pemex itself.

22.     Pursuant to the Ley Reglamentaria del Artículo 27 Constitucional en el Ramo del Petróleo (the "Mexican Petroleum Law"), Pemex and its subsidiaries are the only entities with the legal authority to produce, export, and sell refined and unrefined Mexican hydrocarbons, including natural gas condensate.

23.     Also according to the Mexican Petroleum Law, PEP is responsible for exploration and exploitation of oil and natural gas; its transport, storage in terminals and commercialization. PEP's responsibilities include the production and gathering of natural gas condensate. Pursuant to Mexican law, PEP is the proper entity to bring the claims asserted herein.

24.     P.M.I. Trading Ltd. ("PMI") is a non-governmental affiliate of Pemex. Among other things, PMI markets Mexican hydrocarbons (other than crude oil) in the international energy market. PMI manages all exports of Mexican condensate and other hydrocarbons in the United States.

25.     Mexico's sovereign ownership of its hydrocarbon resources is critical to the nation. Pemex' operations account for approximately 40% of the Mexican government's annual revenues.

## B. The Burgos Field and PEP's Condensate

26.     PEP produces and collects natural gas condensate in its *Activo Integral Burgos* ("Burgos Field"), which is located in northeast Mexico in the states of Tamaulipas, Nuevo León, and Coahuila.

27.     The Burgos Field covers an area of more than 70,000 square kilometers of surface land, roughly the size of Ireland.

28.     PEP operates 2,827 gas wells within the Burgos Field. Gas and condensate produced in those wells is transported to 150 collection stations. Pipelines then transport the gas and condensate from these 150 collection stations to tanks at one of PEP's 52 transfer and delivery systems within the Burgos Field. After collection at the transfer and delivery systems, PEP transports the condensate by pipeline or tanker truck to its central storage facility near Reynosa, Tamaulipas. From there, much of the condensate travels by pipeline to PEP's Burgos gas-processing center. Some condensate is transported by tanker truck to Pemex Refinación's oil refinery in Cadereyta, Nuevo León, Mexico.

29.     For some relevant periods, Pemex also sold PEP's condensate to US end-users. All of those sales were made through PMI, and only through PMI.

30.     PMI, however, did not make sales to small companies or through intermediaries. Like most large producers, Pemex does not generally sell to anyone other than an end-user. Therefore, for sales of hydrocarbons (including condensate) from PEP's Burgos Field, PMI contracts with large end-users. The condensate is sold directly to the end-users in the United States.

31.     Indeed, the only legal way to purchase PEP condensate in the United States is by contract with PEP brokered through PMI.

32.     Since August 2006, no Pemex entity has sold PEP condensate. Thus, any Mexican condensate which entered the United States after August 2006 was stolen and brought in without title or right. Any condensate sole prior to that date was legal only if it originated in a contract brokered by PMI.

## C. The Theft of Mexico's Condensate

33.     In recent years, organized crime groups within Mexico—chiefly drug cartels—have targeted the condensate PEP produces in the Burgos Field.

34.     Taking advantage of the scope and remoteness of the Burgos Field, these cartels use multiple methods to abscond with PEP's condensate.

35.     Most of the condensate was stolen from one or more of PEP's 52 transfer and delivery systems. These transfer and delivery systems are spread throughout remote areas of PEP's Burgos Field in the Mexican states of Tamaulipas, Nuevo León, and Coahuila.

36.     The cartels also hijacked at gunpoint PEP tankers transporting condensate from the transfer and delivery systems to PEP's central storage facility near Reynosa, Tamaulipas.

37.     PEP officials were kidnapped and threatened with violence.

38.     The cartels built tunnels and even their own pipelines to facilitate the thefts. Pipelines were tapped far from any witnesses.

39.     PEP has not sat idly by while Mexico's sovereignty has been invaded by these thefts. Although the condensate is gathered in a remote part of Mexico, extensive efforts have been implemented to guard Mexico's patrimony.

40.     The issue is so important that the coordinated effort to protect Mexico's resources was launched by the President of Mexico, Felipe Calderon. In his words, "this is our national patrimony and we need to defend it."

41.     As part of this effort, PEP enlisted the assistance of the Mexican Army, which was mobilized to guard the fields.

42.     An anonymous hotline was created and the Mexican people exhorted to help stop the looting.

43.     PEP has tried to maintain low liquid levels in remote storage tanks by continuously pumping condensate to collection centers.

44.     PEP has also installed an elaborate electronic system to detect the loss of pressure when condensate is removed from its pipelines and gathering stations. Security cameras were also installed.

45.     Military and private helicopters await any electronic notification of suspicious drops in pressure or other suspicious activities, but the Burgos Field is so expansive that many times it is impossible to get to the theft locations in time to stop the criminals.

46.     In the courts, PEP and the Executive Branch of the Mexican government initiated investigations and criminal charges in Mexico against approximately 140 individuals involved in the Mexican thefts, including two Mexican customs agents who were jailed for allowing tanker trucks of stolen condensate to pass through Mexican customs and into the United States with

fraudulent export documents. Dozens of tanker trucks involved in the scheme, some filled to capacity with stolen PEP condensate, were seized.

47. But, as extensive and costly as PEP's and Mexico's efforts have been, they cannot stop the cartels' pursuit of Mexico's condensate. The cartels are relentless and well-funded. As long as there is a US market for stolen Mexican condensate, the thievery will continue.

48. PEP's efforts are also hampered by the proximity of the US-Mexican border to the Burgos Field. In a reversal of the classic Western movie, Mexican criminals have sought refuge with their ill-gotten gains by crossing the Rio Grande to the North, where the Mexican government has no authority to follow. Once the condensate passes the US-Mexico border, its final destination becomes inherently undiscoverable to PEP.

49. PEP has lost large amounts of its condensate, at times approaching 40% of the production of condensate from the Burgos Field. Since 2006, more than $300 million worth of condensate has been stolen.

## D. The US Market for Stolen Condensate

50. The stolen condensate ends up in the United States and particularly in Texas and neighboring states. There is no market for stolen condensate within Mexico. Condensate is used as a feedstock in a refinery or chemical plant. Within Mexico, only Pemex and its subsidiaries operate such facilities, and they do not repurchase their own stolen condensate. Foreign markets further away than Texas and its neighbors are generally too distant to economically transport the condensate, particularly since its illegal nature makes large scale operations difficult.

51. Thus, without a US market for the stolen condensate, there would be no reason for the thefts and violence in Mexico.

52. All of the Defendants have participated and profited—knowingly or unwittingly—in the trafficking of stolen condensate in the United States and have

thereby encouraged and facilitated the Mexican organized crime groups that stole the condensate.

53.    As set out below, some of the Defendants—Big Star, Superior Crude and F&M—actively and knowingly participated in a conspiracy to import and market the stolen condensate in the United States. Others—like TransMontaigne—participated in the conspiracy negligently because they either knew or should have known their facilities were being used to traffic stolen goods. Others—Hutchinson Hayes, SemCrude, Plains and Western Refining—appear to have been entirely innocent and dealt in the condensate only after it was laundered. Even absent knowledge or intent, however, the Defendants' use, purchase, and sale of stolen Mexican condensate in the United States was without right or title from the Mexican government, and therefore, was wrongful under the laws of Mexico and the United States.

## E. The US Conspiracy to Trade in Stolen Condensate

### 1)  Nature of the Conspiracy

54.    The large petrochemical companies that utilize condensate generally will not knowingly purchase stolen or illegal products, particularly at the market prices garnered by the Defendants.

55.    Therefore, selling the stolen condensate required a coordinated US conspiracy to pass the stolen condensate over the border, to launder its source, to fraudulently distribute and sell the stolen condensate to the ultimate end-users such as Western Refining, and finally to distribute the illicit proceeds from the scheme. This conspiracy was managed and operated by the "Conspiring Defendants"—Superior Crude, F&M, and Big Star—and numerous others within the United States.

56.    Physically, the condensate stolen from PEP was usually taken by tanker truck to areas near the border, where it was transferred into new tanker

trucks meeting the specifications required to pass Mexican and US customs and enter the United States.

57.     To pass the stolen condensate through Mexican and US customs, the Conspiring Defendants and their co-conspirators forged export documents misidentifying their cargo as legitimate PEP exports and may have fraudulently misrepresented the condensate as naphtha, a different hydrocarbon.

58.     To aid the border crossing, the Conspiring Defendants and their co-conspirators also regularly bribed customs officials.

59.     Once the stolen PEP condensate made it into the United States, the Conspiring Defendants and their co-conspirators directed the delivery of the stolen PEP condensate to end-users or to companies that eventually sold the condensate to end-users. These end-users had to be misled into buying the stolen and thus illegal product, which carried no title or right.

*2)  The US Investigations and Prosecutions*

60.     The existence of the US marketing scheme is well established. United States law enforcement agencies, including the Immigration and Customs Enforcement Agency ("ICE") of the Department of Homeland Security, have been investigating the transport and sale of stolen PEP condensate in the United States. The ICE investigation in Texas has already resulted in criminal convictions in the United States District Court for the Southern District of Texas against several individuals who were convicted of receiving and selling, or conspiring to receive and sell, stolen PEP condensate knowing the condensate to have been stolen or unlawfully converted, in violation of 18 U.S.C. §§ 2315 and 371.

61.     Most of the Defendants here dealt directly or indirectly with a company controlled by one of the individuals who have confessed to trafficking in stolen condensate.

## F. *The Individual Roles of the Defendants*

62.     The Defendants each performed various roles.

*(1) Big Star, Jensen, and St. James.*

63.     Big Star is owned and operated by St. James, which in turn is owned and operated by Jensen. Big Star's status as a Texas corporation has been lost, and therefore St. James is liable for its actions. Furthermore, St. James and Jensen are individually liable for Big Star's actions because no corporate distinction should be recognized among them; they are and were alter egos, in part because Big Star was utilized for an illegal purpose and as a sham to perpetuate a fraud. Jensen also actively participated in, and directed, Big Star's conduct.

64.      Big Star voluntarily joined the conspiracy to market and distribute stolen PEP condensate.

65.     Big Star purchased from entities such as Y Oil and Gas, a company that was knowingly involved in the scheme through its owner, Arnoldo Maldonado. Maldonado has pleaded guilty to felony conspiracy to receive and sell stolen goods, specifically Mexican condensate, in his capacity as president of Y Oil and Gas. Big Star would sell the stolen condensate to larger companies such as AGE Refining, a small refinery based in San Antonio, Texas. Big Star may also have sold stolen condensate to Defendant Plains.

66.     Big Star knew that the condensate it purchased and resold was stolen. In the alternative, Big Star either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen. At times, Jensen would travel to Mexico to arrange purchases from the cartels who had stolen the condensate.

67.     As to each of its purchases and sales of PEP condensate, Big Star committed at least the following acts in furtherance of the conspiracy: (a) defrauded the ultimate purchaser of the source and patrimony of the condensate in violation of

state law and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343; (b) knowingly engaged in transactions involving stolen goods in violation of 18 U.S.C. §§ 2314 and 2315 and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

68.     Big Star was aware that the conspiracy was much larger than its individual participation and that for the conspiracy to succeed, additional criminal conduct was needed to conceal the conspiracy from PEP and from US and Mexican authorities, including the bribery of government officials and the forging of documents.

69.     Big Star is responsible for all damages inflicted on PEP from the larger conspiracy.

*(2) F&M*

70.     F&M voluntarily joined the conspiracy to market and distribute stolen PEP condensate.

71.     F&M played an important role in the US conspiracy. F&M both bought and sold condensate and also transported much of condensate bought and sold by other members of the conspiracy.

72.     In particular, F&M bought condensate from, and brokered contracts for, Continental Fuels, whose president has confessed its role in the illegal scheme, and Y Oil and Gas, operated by Arnaldo Maldonado, who also confessed to, and was convicted of, trafficking in condensate stolen from PEP.

73.     F&M shipped or brokered millions of dollars in stolen condensate. For example, in October 2008 F&M purchased 8,500 barrels of "Petroleum Condensate" from Continental Fuels. F&M knew that it was purchasing stolen goods from Continental. F&M sold the condensate to a company that then sold it to Plains. F&M bought this stolen condensate for $539,000, and sold it for a

substantial profit without informing its customer that the condensate was stolen. In the alternative, F&M either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen.

74.     F&M also provided its transportation services to the conspiracy knowing that the condensate it was transporting was stolen. While transporting the condensate, F&M took possession of stolen condensate, knowing it was stolen. In the alternative, F&M either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen. For example, in February 2009, F&M transported more than 21,000 gallons of "petroleum distillates"—a euphemism for condensate designed to disguise its source—from Y Oil and Gas, the seller, to Continental Fuels, the buyer. F&M knew it was transporting stolen condensate on behalf of Y Oil and Gas and Continental. In the alternative, F&M should have known this shipment contained stolen condensate.

75.     As to each of its purchases and sales of PEP condensate, F&M committed at least the following acts in furtherance of the conspiracy: (a) defrauded the ultimate purchaser of the source and patrimony of the condensate in violation of state law and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343; (b) knowingly engaged in transactions involving stolen goods in violation of 18 U.S.C. §§ 2314 and 2315 and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

76.     F&M was aware that the conspiracy was much larger than its individual participation and that for the conspiracy to succeed, additional criminal conduct was needed to conceal the conspiracy from PEP and from US and Mexican authorities, including the bribery of government officials and the forging of documents.

77.     F&M is responsible for all damages inflicted on PEP from the larger conspiracy.

### (3) Hutchinson Hayes

78.     Hutchinson Hayes purchased and resold stolen condensate.

79.     PEP does not allege that Hutchinson Hayes acted with intent or knowledge or that it was a part of any conspiracy.

80.     Although PEP's investigation continues, Hutchinson Hayes purchased and resold millions of dollars worth of stolen condensate. For example, in June of 2007, Hutchison Hayes contracted to sell 100,000 barrels of condensate per month to Murphy Energy Corporation.

81.     Hutchinson Hayes is liable for all of its transactions involving the stolen property of Mexico.

### (4) Plains

82.     Plains is a large, publicly-traded limited partnership that transports, stores, and markets hydrocarbons.

83.     PEP does not allege that Plains acted with intent or knowledge or that it was a part of any conspiracy.

84.     Although PEP's investigation continues, in November 2008, Plains purchased at least $600,000 worth of condensate at its George West LACT, which it then resold. There were other transactions, and on information and belief, much more condensate was purchased and sold by Plains.

85.     Plains is liable for all of its transactions involving the stolen property of Mexico.

### (5) SemCrude

86.     SemCrude is a large, publicly-traded limited partnership that transports, stores, and markets hydrocarbons.

87.     PEP does not allege that SemCrude acted with intent or knowledge or that it was a part of any conspiracy.

88.     Although PEP's investigation continues, SemCrude purchased at least $10,376,000 million in stolen condensate.

89.     In May 2007, SemCrude executed a contract with Continental Fuels, controlled by its President, Timothy Brink. Per the contract, beginning in June of 2007, SemCrude agreed to purchase approximately 50,000 barrels of condensate a month. From the limited records currently available, SemCrude made purchases under this contract as follows:

| Month / Year | Approx. Amount |
| --- | --- |
| July 2007 | $2,198,000 |
| August 2007 | $233,000 |
| September 2007 | $2,113,000 |
| October 2007 | $3,798,000 |
| November 2007 | $1,671,000 |
| December 2007 | $316,000 |
| March 2008 | $132,000 |
| April 2008 | $34,000 |
| Total | $10,376,000 |

90.     In 2010, Brink pleaded guilty to participating in a felony conspiracy to receive and sell stolen property, specifically condensate stolen from Mexico, in his role as president of Continental Fuels.

91.     SemCrude is liable for all of its transactions involving the stolen property of Mexico.

### (6) Superior Crude and Kirby

92.     Superior Crude is owned and operated by Kirby. Kirby is individually liable for Superior Crude's actions because no corporate distinction should be

recognized between them; they are and were alter egos, in part because Superior Crude was utilized for an illegal purpose and as a sham to perpetuate a fraud. Kirby also actively participated in, and directed, Superior Crude's conduct.

93.     Superior Crude voluntarily joined the conspiracy to market and distribute stolen PEP condensate.

94.     Superior Crude was a major distributor of stolen PEP condensate and, on information and belief, also bought and resold condensate for its own account. Superior Crude distributed stolen condensate worth millions of dollars. Superior operated barges and tugs to transport the stolen condensate from storage facilities in Brownsville, Texas and Rio Hondo, Texas to purchasers' facilities in Sun Nederland and Port Arthur, Texas. The coordinator for these shipments was usually Donald Schroeder of Trammo Petroleum. Schroeder has pleaded guilty to felony conspiracy to receive and sell stolen property, specifically Mexican condensate, in his role as president of Trammo Petroleum. Additionally, Superior brokered transactions involving the sale and purchase of stolen condensate.

95.     A typical transaction in which Superior Crude profited from shipping stolen condensate is its shipment, on behalf of Trammo Petroleum, of over 24,000 barrels to Port Arthur in December 2008.

96.     Superior Crude knew that the condensate it was distributing was stolen. In the alternative, Superior Crude either consciously disregarded the fact that the condensate was stolen or should have known that the condensate was stolen.

97.     As to each of its own purchases and sales of PEP condensate, Superior Crude committed at least the following acts in furtherance of the conspiracy: (a) defrauded the ultimate purchaser of the source and patrimony of the condensate in violation of state law and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343; (b) knowingly engaged in transactions involving stolen goods in violation of 18 U.S.C. §§ 2314 and 2315 and the Texas Theft Liability Act (or

TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005; and (c) committed money laundering in violation of 18 U.S.C. § 1956.

98.    As to its transportation services, Superior Crude likewise committed specific acts in furtherance of the conspiracy, including violations of 18 U.S.C. §§ 2314—which applies to "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods ... knowing the same to have been stolen, converted or taken by fraud"—and 2315—which applies to taking possession of property "knowing the same to have been stolen, unlawfully converted, or taken"—and the Texas Theft Liability Act (or TTLA), Tex. Civ. Prac. & Rem. Code § 134.001-.005.

99.    Superior Crude was aware that the conspiracy was much larger than its individual participation and that for the conspiracy to succeed, additional criminal conduct was needed to conceal the conspiracy from PEP and from US and Mexican authorities, including the bribery of government officials and the forging of documents.

100.    Superior Crude is responsible for all damages inflicted on PEP from the larger conspiracy.

### (7) TransMontaigne

101.    TransMontaigne operates terminal facilities in Brownsville, Texas through which much of the stolen condensate passed.

102.    TransMontaigne stored stolen condensate in its facilities with the knowledge or reason to know that the condensate was stolen property or was otherwise illegally obtained.

103.    Although PEP's investigation is continuing, from May 2007 through March 2009, TransMontaigne stored and handled at least $15.679 million of condensate ostensibly owned by Murphy Energy Corporation.

104.    TransMontaigne is liable for stolen condensate held in its facilities.

*(8) Western Refining*

105.   Western Refining is a large, publicly-traded limited partnership that operates refineries.

106.   PEP does not allege that Western Refining acted with intent or knowledge or that it was a part of any conspiracy.

107.   Although PEP's investigation continues, in March of 2007, Western Refining purchased approximately $1.1 million of stolen condensate from Continental Fuels, the President of which has confessed that he knowingly traded in stolen condensate and was sentenced for his crimes.

108.   Western Refining is liable for all of its transactions involving the stolen property of Mexico.

*G. Unjust Enrichment*

109.   All Defendants utilized the sovereign property of Mexico without right or title. As a result, all Defendants were unjustly enriched by any profits, commissions, or other benefits received by the use of PEP's condensate. This is true even if the Defendants did not know the condensate was stolen.

## H. PEP's Damages

110.   As a direct and proximate result of the Defendants' actions, PEP has suffered substantial injuries as a result of having hundreds of millions of dollars worth of PEP condensate stolen to fuel a black market in the United States.

111.   At a minimum, each Defendant is responsible for the stolen condensate they received or used without right or title.

112.   Absent knowledge that the condensate was stolen, the appropriate value for determining PEP's loss is the value as of the date of conversion. This is the value asserted as to Hutchinson Hayes, Plains, SemCrude, and Western Refining.

113.   As to the other Defendants, who knew or should have known the condensate was stolen, the appropriate value for determining PEP's loss is the

highest value of the condensate from the date of theft from PEP through the date suit was filed or through trial.

114.    The Conspiring Defendants—Big Star, Jensen, St. James, Superior Crude, Kirby, and F&M—are also responsible for the actions of all members of the conspiracy, whether named in this action are not, and they are therefore responsible for the value of all condensate stolen from PEP that reached the United States, currently estimated to be more than $300 million.

## V.    DISCOVERY RULE AND FRAUDULENT CONCEALMENT

115.    This suit was brought within two years after PEP knew, or by the exercise of reasonable diligence should have known, of the facts giving rise to PEP's claims against the Defendants. Therefore, limitations have been tolled as to those claims by the "discovery rule."

116.    The conversion and theft of PEP's condensate was a deceptive and fraudulent act. Moreover, it was inherently undiscoverable that the Defendants had taken dominion in the United States of Mexico's sovereign property without right or title, and the resulting injury from the Defendants' wrongful dominion over the sovereign property of Mexico is objectively verifiable.

117.    The Conspiring Defendants actively concealed their conspiracy and illegal actions, and therefore limitations is tolled by the doctrine of "fraudulent concealment."

118.    Mexico and PEP, as sovereign entities, never abandoned their sovereign rights in the stolen condensate.

## VI.    CLAIMS FOR RELIEF

119.    Based on the foregoing facts, incorporated by reference, PEP asserts the following claims for relief.

### A. *First Claim for Relief—Illegal Possession and Use of Mexican Sovereign Property*

120.    This claim is brought under the laws of Mexico.

121.    All Defendants took possession of and utilized sovereign property of the United Mexican States, without title or right. According to Mexican law, PEP is the proper agency of the Mexican government to recover this stolen property, which was and remains the sole and exclusive property of Mexico.

122.    All Defendants have refused to return Mexico's property or to reimburse Mexico for its use.

123.    The Defendants' improper assumption and exercise of dominion and control over PEP's property has and will continue to interfere with and diminish PEP's rights in that property.

124.    Pursuant to the laws of Mexico, the Defendants are liable for their use of Mexico's sovereign property.

125.    PEP is entitled to its actual damages, attorney's fees, and statutory penalties.

### B. *Second Claim for Relief—Conversion Under Texas Law*

126.    All Defendants took possession of and utilized sovereign property of the United Mexican States, without title or right. According to Mexican law, the stolen property was the sole and exclusive property of PEP.

127.    All Defendants have refused to return Mexico's property or to reimburse Mexico for its use.

128.    The Defendants' improper assumption and exercise of dominion and control over PEP's property has and will continue to interfere with and diminish PEP's rights in that property.

129.    PEP is entitled to recover its actual damages. As to Hutchinson Hayes, Plains, SemCrude, and Western Refining, PEP's actual damages are measured by the

market value of the condensate at the time each Defendant took possession. As to the other Defendants, PEP's actual damages are measured at the highest market value for the stolen condensate from the time of these Defendants' possession through the date of suit or trial.

130.    PEP is also entitled to a recovery of exemplary damages from the Conspiring Defendants. The Conspiring Defendants acted with malice as defined by Civil Practices & Remedies Code Section 41.001(7); or were grossly negligent, as defined by Civil Practices & Remedies Code Section 41.001(11). Accordingly, PEP is entitled to an award of exemplary damages against each of the Conspiring Defendants pursuant to Texas Civil Practice and Remedies Code § 41.003 and any other applicable law.

## C. *Third Claim for Relief – Equitable Relief/Constructive Trust/Unjust Enrichment/Money Had and Received*

131.    All Defendants profited from their improper dominion of PEP's property, and therefore, they hold money that in equity and good conscience belongs to PEP.

132.    Allowing the Defendants to retain the benefits received as a result of their acts would unjustly benefit the Defendants at PEP's expense.

133.    PEP is entitled to a recovery of all money from all Defendants that in equity and good conscience belongs to PEP.

134.    As to the Conspiring Defendants, PEP seeks imposition of a constructive trust over all property deriving from the use of such monies in order to maintain and remit to PEP the monies improperly collected by and maintained by the Conspiring Defendants through their wrongful trade in stolen PEP condensate.

### D. *Fourth Claim for Relief—Texas Theft Liability Act*
(Against Big Star, Jensen, St. James, F&M, Superior Crude, TransMontaigne, and Kirby)

135.    The conduct of Big Star, Jensen, St. James, F&M, Superior Crude, and Kirby violated the Texas Theft Liability Act. Tex. Civ. Prac. & Rem. Code §§ 134.001-.005.

136.    The Texas Theft Liability Act prohibits unlawfully appropriating property as defined in the Texas Penal Code. Pursuant to the Texas Penal Code appropriation of property is unlawful if "the property is stolen and the actor appropriates the property knowing it was stolen by another."

137.    PEP is entitled to recover its actual damages, up to $1,000 in additional damages assessed by the trier of fact as to each Conspiring Defendants, and its attorney's fees pursuant to Tex. Civ. Prac. & Rem Code § 134.005.

### E. *Fifth Claim for Relief—Civil Conspiracy*
(Against Big Star, Jensen, St. James, F&M, Superior Crude, and Kirby)

138.    Big Star, Jensen, St. James, F&M, Superior Crude, and Kirby conspired among themselves and others to accomplish unlawful purposes in relation to condensate stolen from PEP. These Defendants had the objective of committing common law conversion of PEP's condensate and the defrauding of end-users which would not have knowingly purchased stolen product. The Conspiracy Defendants had a meeting of the minds on those objectives, committed unlawful, overt acts in furtherance of their objectives and proximately caused PEP to suffer damages as a result.

139.    PEP is, therefore, entitled to recover from the Conspiring Defendants, jointly and severally, PEP's actual and exemplary damages resulting from the conspiracy.

## VII.   JURY TRIAL DEMAND

140.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, PEP demands a trial by jury.

## VIII. PRAYER FOR RELIEF

PEP respectfully prays that this Court award it all relief to which it is entitled under law or equity, including the imposition of constructive trusts.

Dated: May 26, 2011


Respectfully submitted,


By: /s/ Mark Maney

Mark Maney
Attorney-in-Charge
Texas Bar No. 12898200
Federal ID: 11815
Christopher Register
(not admitted)
D.C. Bar No. 997688
1000 Louisiana, Suite 2800
Houston, Texas 77002
Telephone: 713.806.2500
mmaney@maneylaw.com

ATTORNEYS FOR PEMEX EXPLORACIÓN Y PRODUCCIÓN