# EXHIBIT  F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, | § § § § § § § | |
| Plaintiff, | | |
| v. | § § § | |
| BASF CORPORATION; MURPHY ENERGY CORPORATION; TRAMMO PETROLEUM, INC.; BIO-NU SOUTHWEST, INC. d/b/a VALLEY FUELS; US PETROLEUM DEPOT, INC.; DONALD P. SCHROEDER, JR.; ARNOLDO MALDONADO; JONATHAN DAPPEN; STEPHEN PECHENIK; TIMOTHY L. BRINK; AND JOSHUA CRESCENZI, | § § § § § § § § § § § § | Civil Action No. JURY TRIAL REQUESTED |
| Defendants. | § § | |

**PLAINTIFF PEMEX EXPLORACIÓN Y PRODUCCIÓN'S ORIGINAL COMPLAINT**

Plaintiff PEMEX Exploración y Producción ("PEP") brings this complaint against the Defendants named herein to recover damages. The allegations are asserted on information and belief after due investigation, except as to those matters that relate to Plaintiff and its own acts, which are asserted on personal knowledge.

## I.     NATURE OF THE CASE

1.      Mexico is one of the largest oil and gas producing nations in the world. Its extensive reserves are wholly owned by the Mexican government through its national oil company, Petróleos Mexicanos ("Pemex"), for the benefit of the people of Mexico. The Pemex subsidiary responsible for oil and gas production is PEMEX Exploración y Producción ("PEP"),

the plaintiff in this action. PEP's production accounts for one-third of the Mexican government's annual revenues.

2.      In recent years, organized crime in Mexico has targeted PEP's oil and gas production, in particular natural gas condensate. Condensate is a high-value, petroleum-based liquid produced in conjunction with natural gas in PEP's large Burgos Field in northern Mexico. Criminal enterprises, under threat of violence to PEP employees and the public, steal condensate from storage facilities and hijack trucks hauling condensate to Pemex refineries. At times, the quantity stolen has approached 40% of the entire production of condensate from the Burgos Field. Since 2006, the total value of stolen condensate has exceeded $300 million.

3.      The Defendants in this action have directly assisted and encouraged this theft and violence by actively participating in the smuggling of stolen condensate into the United States and/or purchasing it for use in Texas. Several of the Defendants who knowingly transported and sold stolen condensate have pled guilty to their crimes and are awaiting sentencing. Defendant BASF purchased stolen condensate for use in its Port Arthur, Texas plant. BASF's payments are funds that rightfully belong to PEP for the benefit of the people of Mexico. They instead are being used by the criminal enterprise to fuel further violence and illegal activities there.

4.      PEP has not sat idly by while its property has disappeared. It has installed an electronic system to detect the loss of pressure when condensate is removed from its pipelines and gathering stations. It has initiated an investigation and filed several criminal charges in Mexico. It has seized dozens of tanker trucks involved in the scheme, some filled to capacity with stolen Burgos condensate. And its investigation has led to the detention of at least forty individuals in Mexico, including two Mexican customs agents who have been jailed for allowing tanker trucks of stolen condensate to pass through Mexican customs and into the United States

with fraudulent export documents.  The government has even called on the Mexican Army, summoning helicopters and trucks filled with soldiers, whenever PEP's computer system detects suspicious drops in pressure at its condensate transfer and delivery systems.

5.     But, as extensive and costly as PEP's efforts have been, they cannot stop organized crime's relentless pursuit of the company's condensate supply.  These criminals are determined and well funded.  As long as they see a market for stolen PEP condensate, they will find a way to steal it.  And as long as Defendant BASF continues to buy stolen product in the United States, the criminal enterprise in Mexico and the United States will remain viable.

## II.     **PARTIES**

6.     PEMEX Exploración y Producción ("PEP") is a subsidiary of Pemex, Mexico's state-owned oil and gas company.  PEP is headquartered in, and has its principal place of business in, Mexico City, Mexico.

7.     Defendant BASF Corporation ("BASF") is a corporation incorporated under the laws of Delaware with its principal place of business in Florham Park, New Jersey, and operations at Highway 366, Gate 99, Port Arthur, Texas 77643.  BASF may be served with process by serving its registered agent CT Corporation System at 350 N. St. Paul St. Suite 2900, Dallas, Texas 75201-4234.

8.     Defendant Murphy Energy Corporation ("Murphy Energy") is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma, and an office in The Woodlands, Texas.  Murphy Energy may be served with process by serving its registered agent Gregory A. Westfall at 1776 Woodstead Court, Suite 226, The Woodlands, Texas  77380.

9.     Defendant Trammo Petroleum, Inc. ("Trammo Petroleum") is a Delaware corporation with its principal place of business in Houston, Texas.  Trammo Petroleum may be

HUI-127905v1

served with process by serving its registered agent Corporation Service Company d/b/a CSC -

Lawyers Incorporating Service Company at 211 E. 7th St., Suite 620, Austin, Texas 78701.

10.     Defendant Bio-NU Southwest, Inc. d/b/a Valley Fuels ("Valley Fuels") is a Texas

corporation with its principal place of business in San Antonio, Texas.  Bio-NU Southwest, Inc.

may be served with process by serving its registered agent, its president and director Stephen

Pechenik, at 8026 Vantage #202, San Antonio, Texas 78230.

11.     Defendant US Petroleum Depot, Inc. ("USPD") is a Nevada corporation with its

principal place of business in Jacksboro, Texas, and operations in the Port of Brownsville, Texas.

USPD may be served with process by serving its registered agent, Christopher J. McCauley, at

124 North Church, Jacksboro, Texas 76458.

12.     Defendant Donald P. Schroeder, Jr. ("Schroeder") is a Texas citizen who lives in

Houston, Texas.  At times relevant to Plaintiff PEP's claims, Schroeder served as, and acted

within the scope of his employment as, president of Defendant Trammo Petroleum.  Schroeder

may be served with process at 807 Rosine St., Houston, Texas  77019-1938.

13.     Defendant Arnoldo Maldonado ("Maldonado") is a Texas citizen who lives in

Edinburg, Texas.  At times relevant to Plaintiff PEP's claims, Maldonado served as, and acted

within the scope of his employment as, president of non-defendant co-conspirator Ygriega

Energy Company d/b/a Y Oil and Gas ("Y Oil and Gas").  Maldonado may be served with

process at 222 W. University Drive, Edinburg, Texas 78539.

14.     Defendant Jonathan Dappen ("Dappen") is a Texas citizen who lives in McAllen,

Texas.  At times relevant to Plaintiff PEP's claims, Dappen served as, and acted within the scope

of his authority as, an authorized agent of non-defendant co-conspirator Petro Salum.  Dappen

may be served with process at 704 S. 1st St., McAllen, Texas 78501-1123.

- 4 -

15.    Defendant Stephen Pechenik ("Pechenik") is a Texas citizen who lives in San Antonio, Texas.  At times relevant to Plaintiff PEP's claims, Pechenik served as, and acted within the scope of his employment as, president of Defendant Valley Fuels.  Pechenik may be served with process at 8000 Donore Pl., Unit 3, San Antonio, Texas 78229-2676.

16.    Defendant Timothy L. Brink ("Brink") is a Texas citizen who lives in San Antonio, Texas.  At times relevant to Plaintiff PEP's claims, Brink served as, and acted within the scope of his employment as, president of non-defendant co-conspirator Continental Fuels, Inc.  Brink may be served with process at 17239 Shavano Rn. #12201, San Antonio, Texas 78257-1352.

17.    Defendant Joshua Crescenzi ("Crescenzi") is a Texas citizen who lives in Houston, Texas.  At times relevant to Plaintiff PEP's claims, Crescenzi served as, and acted within the scope of his employment as, vice president of operations for non-defendant co-conspirator Continental Fuels, Inc.  Crescenzi may be served with process at 2424 Sawyer Heights St. #422, Houston, Texas  77007-7546.

### III.    JURISDICTION AND VENUE

18.    Pursuant to 28 U.S.C. §§ 1331 and 1337, and 18 U.S.C. § 1964(c), this Court has original subject matter jurisdiction over Plaintiff's causes of action arising under RICO. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's causes of action arising under conversion, money had and received, and civil conspiracy because these state law causes of action are so related to the Plaintiff's RICO claims in this action that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction over the Texas state law claims in this case because the controversy is between a foreign state, as defined in 28 U.S.C. § 1603(a), as Plaintiff and citizens

- 5 -

of a State or of different States, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  28 U.S.C. § 1332 (a)(4).

19.     Venue is proper in the Southern District of Texas because Defendants BASF Corporation, Murphy Energy, Trammo Petroleum, Valley Fuels, USPD, Maldonado, Dappen, Pechenik, Brink, and Crescenzi reside in the Southern District of Texas and a substantial part of the events and transactions giving rise to the controversy and the harms complained of occurred in the Southern District of Texas, as required by 28 U.S.C. § 1391.

## IV.     FACTUAL BACKGROUND

### A.     Background of Pemex and PEP

20.     Formed in 1938, Pemex is Mexico's state-owned petroleum company.  It is the 10th largest oil company in the world and one of the biggest business enterprises in Mexico and Latin America.

21.     Pemex and its subsidiaries are the only entities with the legal right to produce, export, and sell refined and unrefined Mexican hydrocarbons, including crude oil, natural gas, natural gas condensate, naphtha, and other materials.

22.     Pemex operates through its subsidiary operating entities, including PEMEX Exploración y Producción, i.e., PEP, the Plaintiff in this action.

23.     Of the subsidiaries, PEP is responsible for oil and natural gas exploration, conveyance, storage in terminals, and first hand commercialization.

24.     PEP's responsibilities include the production and gathering of natural gas condensate.

25.     Natural gas condensate (also referred to as simply "condensate" or "gas condensate") is a mixture of hydrocarbons in liquid form produced in natural gas production. Condensate is generally transported in liquid form and used as light feedstock for refineries and

- 6 -

petrochemical plants. Because it often contains very few contaminants and can easily be refined into high-value oil products, condensate is particularly valuable and often competes directly with light crude oil in downstream oil markets.

**B.**     **Collection and Transport of PEP Condensate**

26.     PEP produces and collects natural gas condensate from among the 2,827 wells in its Activo Integral Burgos ("Burgos Field"), which is located in northeast Mexico in the states of Tamaulipas, Nuevo León, and Coahuila.

27.     From these wellheads, PEP transports condensate via pipeline to its 150 collection stations. And from there, the condensate travels by pipeline to tanks at one of PEP's 52 transfer and delivery systems.

28.     After collection at the transfer and delivery systems, PEP transports the condensate via either pipeline or tanker truck to its central storage facility near Reynosa, Tamaulipas. From there, much of the condensate travels by pipeline to PEP's Burgos gas-processing center, and some condensate is transported via tanker truck to Pemex Refinación's oil refinery in Cadereyta, Nuevo León, Mexico.

**C.**     **PEP Export of Hydrocarbons**

29.     P.M.I. Trading Ltd. ("PMI") markets Mexican hydrocarbons in the international energy market. PMI manages PEP imports and exports of crude oil, refined products, and other hydrocarbons in the United States.

30.     To export hydrocarbons from PEP's Burgos Field, PMI contracts with Mexican transport companies to pick up the relevant hydrocarbons from PEP in Mexico, transport those hydrocarbons across the Mexico/U.S. border in tanker trucks, and deliver the hydrocarbons directly to U.S. refineries and other end users, to whom PMI sells the particular hydrocarbons.

31.     Official PEP transports of hydrocarbons, brokered by PMI and transported by companies under contract with PEP and/or PMI to do so are the only legal way PEP condensate from the Burgos Field can enter the United States.  The Defendants were never authorized transporters, exporters, or importers of PEP hydrocarbons, including condensate.

32.     From August 1, 2006 to the present, neither Pemex, PEP, PMI, nor any Pemex affiliate exported PEP condensate from the Burgos Field into the United States.  Thus, no legitimate PEP condensate has entered the United States since August 1, 2006.

**D.     Defendants' Background**

33.     Defendant BASF, at its Port Arthur, Texas, location, operates the world's largest steam cracker.  Defendant BASF is an end user of natural gas condensate that purchased stolen PEP condensate from Defendant Trammo Petroleum, a company conspiring with criminal organizations in Mexico.

34.     Defendant Murphy Energy provides producer services, marketing services, and transportation services for various hydrocarbons, including crude oil, condensate, and natural gas liquids.  Murphy Energy is a distributor of natural gas condensate that purchased stolen PEP condensate from non-defendant co-conspirator Continental Fuels, Inc. ("Continental Fuels") and sold stolen PEP condensate to Defendant Trammo Petroleum, both of which were conspiring with criminal organizations in Mexico.

35.     Defendant Trammo Petroleum, a subsidiary of Transammonia Group, is engaged in the gathering, marketing of crude oil and refined products in the United States.  Acting through its president, Defendant Schroeder, as a member of the criminal conspiracy, Trammo Petroleum knowingly purchased stolen PEP condensate from non-defendant co-conspirator Continental Fuels.  Trammo Petroleum then sold that condensate to Defendant BASF.

36.     Defendant Valley Fuels is a company that purchases, sells, and transports hydrocarbons within Texas and worldwide. Acting through its president, Defendant Stephen Pechenik, as a member of the criminal conspiracy, Valley Fuels knowingly coordinated stolen PEP condensate deliveries by co-conspirator importing/exporting companies to non-defendant co-conspirator Continental Fuels.

37.     Defendant USPD, once a wholly owned subsidiary of non-defendant co-conspirator Continental Fuels, owns and operates a 48,000 barrel petroleum storage facility (i.e., terminal) located in the Port of Brownsville, Texas. This terminal is used for storage and transport of condensate for use in the blending of gasoline or sale in the U.S. market. The terminal includes truck and rail on- and off-loading terminals and is able to handle barges and tankers up to the Suez-max size. Defendant USPD took actual physical possession of the stolen PEP condensate delivered to Continental Fuels in Brownsville, Texas.

38.     Non-defendant co-conspirator Petro Salum, through its authorized agent Defendant Dappen, acted as a member of the criminal conspiracy. Petro Salum knowingly transported stolen PEP condensate into the United States from Mexico and delivered that condensate to non-defendant co-conspirator Continental Fuels.

39.     Non-defendant co-conspirator Importadora Exportadora, acting as a member of the criminal conspiracy, knowingly transported stolen PEP condensate into the United States from Mexico and delivered that condensate to non-defendant co-conspirator Continental Fuels.

40.     Non-defendant co-conspirator Continental Fuels was at times relevant to PEP's claims a publicly traded company with an emphasis on nationwide distribution and retail gasoline operations, as well as international sourcing, marketing, and distribution of upstream and downstream petroleum products. Acting through its president, Defendant Brink, and its vice

president of operations, Defendant Crescenzi, as a member of the criminal conspiracy, Continental Fuels knowingly purchased and stored stolen PEP condensate it received from co-conspirator importing/exporting companies, such as non-defendant co-conspirator Petro Salum. Continental Fuels sold that stolen condensate to co-conspirator Defendant Trammo Petroleum and to Defendant BASF and Defendant Murphy Energy.

     41.     Non-defendant co-conspirator Y Oil and Gas, acting through its president, Defendant Maldonado, as a member of the criminal conspiracy, knowingly coordinated deliveries of stolen PEP condensate by importing/exporting companies to non-defendant co-conspirator Continental Fuels.

     42.     At all times relevant to this complaint, Defendant Schroeder served as president of, acted within the scope of his employment as president of, and acted with authority from, Trammo Petroleum.  On May 29, 2009, Schroeder pleaded guilty to knowingly conspiring to receive and sell stolen PEP condensate in his position as president of Defendant Trammo Petroleum, in violation of 28 U.S.C. §§ 2315 and 371.  Schroeder is scheduled to be sentenced for his crimes later this year.

     43.     At all times relevant to this complaint, Defendant Maldonado served as president of, acted within the scope of his employment as president of, and acted with authority from, Y Oil and Gas.  On September 25, 2009, Maldonado pleaded guilty to knowingly conspiring to receive and sell stolen PEP condensate in his position as president of Y Gas and Oil, in violation of 28 U.S.C. §§ 2315 and 371.  Maldonado is scheduled to be sentenced for his crimes later this year.

     44.     At all times relevant to this complaint, Defendant Dappen—a broker for purchases and sales of hydrocarbons—served as an authorized agent of, and acted within the

scope of his agency with and with authority from, Petro Salum. On October 2, 2009, Dappen

pleaded guilty to knowingly conspiring to receive and sell stolen PEP condensate in his position

as agent for Petro Salum, in violation of 28 U.S.C. §§ 2315 and 371. Dappen is scheduled to be

sentenced for his crimes later this year.

45.     At all times relevant to this complaint, Defendant Pechenik served as president of,

acted within the scope of his employment as president of, and acted with authority from, Valley

Fuels. On October 9, 2009, Pechenik pleaded guilty to knowingly conspiring to receive and sell

stolen PEP condensate in his position as president of Defendant Valley Fuels, in violation of 28

U.S.C. §§ 2315 and 371. Pechenik is scheduled to be sentenced for his crimes later this year.

46.     At all times relevant to this complaint, Defendant Brink served as president of,

acted within the scope of his employment as president of, and acted with authority from,

Continental Fuels. On May 14, 2010, Brink pleaded guilty to knowingly conspiring to receive

and sell stolen PEP condensate in his position as president of Continental Fuels, in violation of

28 U.S.C. §§ 2315 and 371. Brink is scheduled to be sentenced for his crimes on August 20,

2010.

47.     At all times relevant to this complaint, Defendant Crescenzi served as vice

president of operations for, acted within the scope of his employment as vice president of

operations for, and acted with authority from, Continental Fuels. Acting as a member of the

criminal conspiracy, Crescenzi knowingly conspired to receive and sell stolen PEP condensate in

his position as vice president of operations for Continental Fuels.

48.     None of the Defendants or their non-defendant co-conspirators have ever been

affiliated with PEP or any of its subsidiaries in any way. Nor have any of the Defendants or their

non-defendant co-conspirators ever been authorized to export PEP hydrocarbons from Mexico or import PEP hydrocarbons into the United States.

### E.    PEP Condensate Stolen in Mexico and Smuggled into the United States

49.    In late 2008 and the first few months of 2009, criminals associated with some or all of the named Defendants stole PEP natural gas condensate from PEP's Burgos Field.

50.    During that time period, millions of dollars worth of Burgos condensate was stolen from PEP in Mexico.

51.    Most of the natural gas condensate stolen by the criminal enterprise from the Burgos Field was taken from one or more of PEP's 52 transfer and delivery systems. These transfer and delivery systems are spread throughout remote areas of PEP's Burgos Field in the Mexican states of Tamaulipas, Nuevo León, and Coahuila. The criminal enterprise also stole natural gas condensate in Tamaulipas, Nuevo León, and/or Coahuila by hijacking at gunpoint PEP tanker trucks transporting condensate from the transfer and delivery systems to PEP's central storage facility near Reynosa, Tamaulipas.

52.    The natural gas condensate stolen from PEP was loaded into tanker trucks, which were then driven by the thieves or their co-conspirators to the area of Matamoros, Tamaulipas, Mexico. In or around Matamoros, the stolen condensate was transferred into new tanker trucks meeting the specifications required to pass Mexican and U.S. customs and enter the United States.

53.    At some point south of the Mexico/U.S. border, the newer tanker trucks containing the stolen condensate were received by importers, including non-defendant co-conspirator Petro Salum acting through its authorized agent, Defendant Dappen, and non-defendant co-conspirator Importadora Exportadora (collectively, the "Importers"). The Importers knew at the time they received and exercised control over the tanker trucks that the

- 12 -

condensate was the stolen property of PEP, yet they used those tanker trucks to transport the stolen PEP condensate through Mexican and U.S. customs, across the Mexico/U.S. border, and into Texas.

54.    In order to get the stolen PEP condensate through Mexican and U.S. customs and into the United States, the Importers used forged export documents misidentifying their cargo as legitimate PEP exports and may have fraudulently misrepresented the condensate as naphtha, a completely different hydrocarbon.

**F.    Defendants Gather Stolen PEP Condensate at Storage Facilities**

55.    Once the stolen condensate made it into the United States, the Importers worked with Defendant Valley Fuels acting through its president, Defendant Pechenik, and non-defendant co-conspirator Y Oil and Gas acting through its president, Defendant Maldonado. With knowledge that the condensate in question was stolen property of PEP, these other companies (collectively, the "Coordinators") received, and coordinated the movement of, the stolen condensate within Texas.

56.    Together, the Importers and the Coordinators directed the delivery of the stolen PEP condensate to non-defendant co-conspirator Continental Fuels, acting through its president, Defendant Brink, and through its vice president of operations, Defendant Crescenzi.  Continental Fuels had sufficient storage capacity to collect and resell the illicit hydrocarbons.

57.    As an example of how the Defendants' import and gathering scheme worked in practice, one or more of the Importers would call Defendant Maldonado and report by telephone how many tanker trucks of stolen condensate would cross the Mexico/U.S. border into Texas on a given morning, and Maldonado would report that information by placing telephone calls to non-defendant co-conspirator Continental Fuels.

HUI-127905v1

58.    Knowing deliveries of stolen PEP condensate through these channels to Continental Fuels at the Port of Brownsville, Texas, included the following:

A.    On or about January 26, 2009, non-defendant co-conspirators Petro Salum and Y Oil and Gas, acting through Defendants Dappen and Maldonado, respectively, coordinated the delivery to Continental Fuels of ten tanker trucks of stolen PEP condensate, with the knowledge of Defendants Brink and Crescenzi;

B.    On or about February 19, 2009, Defendant Valley Fuels, acting through Defendant Pechenik, worked with non-defendant co-conspirator Importadora Exportadora to coordinate the delivery to Continental Fuels of two tanker trucks of stolen PEP condensate, with the knowledge of Defendants Brink and Crescenzi;

C.    On or about February 27, 2009, non-defendant co-conspirator Y Oil and Gas, acting through Defendant Maldonado, coordinated the delivery to Continental Fuels of six tanker trucks of stolen PEP condensate, with the knowledge of Defendants Brink and Crescenzi; and

D.    On or about March 3, 2009, Petro Salum, Y Oil and Gas, and Defendant Valley Fuels, acting through Defendants Dappen, Maldonado, and Pechenik, respectively, coordinated the delivery to Continental Fuels at least seven tanker trucks of stolen PEP condensate, with the knowledge of Defendants Timothy Brink and Joshua Crescenzi.

59.    Defendant USPD, then a wholly owned subsidiary of non-defendant co-conspirator Continental Fuels, took actual physical possession of the stolen PEP condensate delivered to Continental Fuels in the Port of Brownsville, Texas.

- 14 -

### G.   Defendants Knowingly Launder and Sell the Stolen Condensate

60.   Defendant USPD and non-defendant co-conspirator Continental Fuels then stored the product in the Port of Brownsville, Texas, until there was a sufficient quantity of condensate to load on a barge for delivery to an end user.

61.   Generally, the condensate physically stayed with the co-conspirator storage company Defendant USPD and non-defendant Continental Fuels, or at least in their tanks, until it was transported to Defendant BASF.  However, certain amounts of condensate were also sold by non-defendant co-conspirator Continental Fuels to intermediaries:  Defendant Murphy Energy and Defendant Trammo Petroleum, acting through its president, Defendant Schroeder.

62.   At the time Defendant Trammo Petroleum, through Defendant Schroeder, purchased the condensate in question from non-defendant co-conspirator Continental Fuels and Defendant Murphy Energy, Defendants Trammo Petroleum and Schroeder knew that the material was stolen PEP property.  Defendant Schroeder was contacted by Murphy Energy and Continental Fuels and told by both that they had Mexican condensate they would like to sell.  Shortly thereafter, Defendant Crescenzi, acting on behalf of Continental Fuels, called Defendant Schroeder and told Defendant Schroeder that the condensate in question was stolen.  Defendant Schroeder then "bought it and sold it," understanding the unlawful purpose of the conspiracy that was going on then.

63.   Defendant Trammo Petroleum, through arrangements made by Defendant Schroeder, purchased the stolen PEP condensate from Murphy Energy and Continental Fuels in 2009.  Defendant Trammo Petroleum, working through Defendant Schroeder, sold the stolen PEP condensate to Defendant BASF in the barge operation beginning in January 2009.  For example, on or about February 7, 2009, Defendant Schroeder and other co-conspirators were responsible for the loading of a barge containing stolen condensate at Defendant USPD's facility

- 15 -

in the Port of Brownsville, Texas.  The barge then transported the stolen condensate to Port

Arthur, Texas, where the stolen PEP condensate was ultimately sold to Defendant BASF by

Defendant Trammo Petroleum, acting through Defendant Schroeder.

**H.     End User Defendant BASF Irretrievably Converted PEP's Stolen**
**Condensate For Its Own Benefit**

64.     Upon receiving stolen PEP condensate, such as the barge load Defendant BASF

purchased from Defendant Trammo Petroleum on or about February or March 2009, Defendant

BASF converted the material for its own benefit.  In general, Defendant BASF uses condensate

as a feedstock for its steam cracker facility in Port Arthur, Texas.  Once processed by BASF in

Port Arthur, Texas, the condensate is converted into other products BASF uses for its own

benefit.

**I.     Various Defendants Discuss Their Illegal Scheme**

65.     Various Defendants participated in telephone conversations in 2008 and 2009

during which arrangements for the sale and transport of the stolen PEP condensate were

discussed.  For example:

A.     On or around January 20, 2009, Defendant Schroeder participated in a

telephone conversation with an employee of non-defendant co-conspirator Continental Fuels in

which they discussed the problems involved in the import of stolen PEP condensate.

B.     On or about January 6, 2009, Defendant Maldonado participated in a

telephone conversation with an employee of non-defendant co-conspirator Continental Fuels in

which they discussed the problems involved in the import of stolen PEP condensate through

customs and the problems with payoffs that would be required, such as that "somebody in the

bridge was not cooperating with the people in Mexico."

C.     On or about January 15, 2009, January 21, 2009, and January 23, 2009, Defendant Dappen discussed the payment for the transport of stolen condensate with a representative of non-defendant co-conspirator Continental Fuels.

**J.     Defendants Profit from Their Trade in Stolen PEP Condensate**

66.     Each of the Defendants in this suit were unjustly enriched as a result of their participation in their scheme to trade in stolen PEP condensate.

67.     In 2009, non-defendant co-conspirator Continental Fuels used wire transfers to bank accounts to pay Defendants Valley Fuels, Dappen, Maldonado, and Pechenik, as well as non-defendant co-conspirators Petro Salum, Importadora Exportadora, and Y Oil and Gas, for the deliveries of stolen PEP condensate.

68.     Non-defendant co-conspirator Petro Salum received payment of approximately $136,000 from Continental Fuels for at least seventeen tanker trucks of stolen PEP condensate in January-March 2009.

69.     For his part in the scheme, Defendant Dappen received at least $69,000 in 2009.

70.     Defendant Maldonado, non-defendant co-conspirator Y Oil and Gas, and others were responsible for the transport and sale of at least $995,019 in stolen PEP condensate in Texas:  $244,507 in January 2009; $544,816 in February 2009; and $205,696 in March 2009. For their part in the scheme, Defendant Maldonado and non-defendant co-conspirator Y Oil and Gas received at least $327,019.

71.     On or about January 2009 to October 2009, Defendants Valley Fuels and Pechenik and non-defendant co-conspirator Importadora Exportadora were responsible for the import, transport, and sale of at least $284,269 in stolen PEP condensate in Texas.  For his part in the scheme, Defendant Pechenik received from Continental Fuels a commission of at least

- 17 -

$5,463. Continental Fuels paid Importadora Exportadora by wire transfer and paid Pechenik $1 for every barrel that was delivered.

72.     Defendants Schroeder and Trammo Petroleum were responsible for the sale and barging of millions of dollars worth of stolen PEP condensate in 2009, and the corresponding profits received by Defendant Trammo Petroleum totaled at least $150,000.

73.     From January to March 2009, non-defendant co-conspirator Continental Fuels made as much as $200,000 in profit off its sales of stolen PEP condensate.

### K.     The U.S. Government Investigates and Prosecutes Certain Defendants

74.     Recently, law enforcement agencies in the United States, including the U.S. Immigrations and Customs Enforcement ("ICE"), have been investigating the transport and sale of stolen PEP condensate in the United States.

75.     The ICE investigation in Texas resulted in criminal charges in the U.S. District Court for the Southern District of Texas against the following individual defendants: Donald Schroeder, Arnoldo Maldonado, Jonathan Dappen, Stephen Pechenik, and Timothy Brink.

76.     These individual defendants were charged with receiving and selling, or conspiring to receive and sell, stolen PEP condensate knowing the condensate to have been stolen or unlawfully converted, in violation of 28 U.S.C. §§ 2315 and 371.

77.     Defendants Schroeder, Maldonado, Dappen, Pechenik, and Brink have entered a guilty plea in response to the respective charges against them and await sentencing later this year.

### L.     RICO Defendants' Conversion Scheme

78.     As described in this Complaint, at all relevant times, Defendants Trammo Petroleum, Valley Fuels, USPD, Jonathan Dappen, Arnoldo Maldonado, Stephen Pechenik, Timothy Brink, Joshua Crescenzi, and Donald Schroeder (collectively, the "RICO Defendants")

- 18 -

and their co-conspirators—including non-defendant co-conspirators Continental Fuels, Y Oil and Gas, Petro Salum, Importadora Exportadora, and others—participated in a scheme to steal natural gas condensate from PEP in Mexico, transport the stolen PEP condensate across the Mexico/U.S. border, and sell the condensate for profit to third parties in the United States (the "RICO Scheme").

79.    At all relevant times, the RICO Defendants and their co-conspirators formed an "association-in-fact" through their efforts to coordinate and carry out the theft, transportation into the United States, and the marketing to end users of PEP condensate.  The association-in-fact had a defined structure.

80.    Each member of the association-in-fact had well-defined roles and responsibilities.  The criminal co-conspirators in Mexico stole the PEP condensate from the Burgos Field in northern Mexico, transported the stolen condensate to or near the Mexico/U.S. border, and handed the stolen condensate over to the Importers (Importadora Exportadora and Petro Salum, acting through its authorized agent, Defendant Dappen).

81.    The Importers then transported the stolen condensate across the Mexico/U.S. border and into the United States, using forged export documents misidentifying their cargo as legitimate PEP export, and worked with the Coordinators (Defendant Valley Fuels acting through its president, Defendant Pechenik, and non-defendant co-conspirator Y Oil and Gas acting through its president, Defendant Maldonado) to direct the delivery of the stolen PEP condensate to Defendant USPD and non-defendant co-conspirator Continental Fuels, acting through its president, Defendant Brink, and through its vice president of operations, Defendant Crescenzi.

82.     Continental Fuels paid the Coordinators and Importers by wire for the deliveries of condensate, and a portion of those wires were sent from the United States to bank accounts in Mexico.  Continental Fuels and Defendant USPD then stored the stolen condensate until there was a sufficient quantity of condensate to load on a barge for delivery to an end user.

83.     Generally, the condensate physically stayed with Continental Fuels or Defendant USPD until it was delivered to an end user, but certain amounts of the stolen PEP condensate were sold to intermediaries Defendant Murphy Energy and Defendant Trammo Petroleum, acting through its president, Defendant Schroeder, who eventually sold the stolen condensate to Defendant BASF, an end user.

84.     This association-in-fact had a unity of purpose:  to steal PEP condensate, transport it into the United States, and sell it for profit to end users.  Members of the association-in-fact contemplated that the relationships would continue indefinitely.  As such, this "association in fact" was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and is referred to herein as the "Conversion Enterprise."

## M.     RICO Defendants' Racketeering Activity

85.     As described in detail in this Complaint, the RICO Defendants and their co-conspirators within the Conversion Enterprise participated in the RICO Scheme.  The RICO Defendants and their co-conspirators, acting singly and in concert, and personally or through their agents, repeatedly and knowingly (i) transported stolen PEP condensate across the Mexico/U.S. border and into the United States;  (ii) sold or received PEP condensate that had been transported across the Mexico/U.S. border in the United States after being stolen; (iii) conducted or attempted to conduct financial transactions involving the proceeds of the unlawful transport, receipt, and sale of stolen PEP condensate with the intent to promote the carrying on of such unlawful transport, receipt, and sale; and (iv) transported, transmitted,

HUI-127905v1

transferred, or attempted to transport, transmit, or transfer, funds from a place in the United

States to a place in Mexico with the intent to promote the carrying on of such unlawful transport,

receipt, and sale of stolen PEP condensate.  The RICO Defendants and their co-conspirators

thereby engaged in a pattern of racketeering activity.

### (1)    RICO Defendants conduct in furtherance of conversion scheme

86.    Among the acts that were part of and in furtherance of the RICO Defendants'

RICO Scheme were the following examples of knowing transports of natural gas condensate

stolen by the RICO Defendants' co-conspirators in Mexico:

A.    On or about January 26, 2009, Defendants Dappen and Maldonado, non-

defendant co-conspirators Petro Salum and Y Oil and Gas, and their co-conspirators arranged for

ten tanker trucks of stolen PEP condensate to be transported from Mexico into the United States,

knowing the condensate in question to have been stolen from PEP in Mexico;

B.    On or about February 7, 2009, Defendants Brink, Crescenzi, Trammo

Petroleum, and Schroeder, non-defendant co-conspirator Continental Fuels, and their co-

conspirators arranged for a barge of stolen PEP condensate to be transported by barge from

USPD's terminal within the Port of Brownsville, Texas, to Port Arthur, Texas, for resale to

Defendant BASF, knowing the condensate in question to have been stolen from PEP in Mexico;

C.    On or about February 19, 2009, Defendants Valley Fuels and Pechenik

and their co-conspirators arranged for two tanker trucks of stolen PEP condensate to be

transported from Mexico into the United States, knowing the condensate in question to have

been stolen from PEP in Mexico;

D.    On or about February 27, 2009, Defendant Maldonado, non-defendant co-

conspirator Y Oil and Gas, and their co-conspirators arranged for six tanker trucks of stolen PEP

condensate to be transported from Mexico into the United States, knowing the condensate in question to have been stolen from PEP in Mexico;

E.   On or about March 3, 2009, Defendant Dappen, non-defendant co-conspirator Petro Salum, and their co-conspirators arranged for seven tanker trucks of stolen PEP condensate to be transported from Mexico into the United States, knowing the condensate in question to have been stolen from PEP in Mexico; and

F.   On or about March 3, 2009, Defendants Maldonado, Pechenik, and Valley Fuels, non-defendant co-conspirators Importadora Exportadora and Y Oil and Gas, and their co-conspirators arranged for six tanker trucks of stolen PEP condensate to be transported from Mexico into the United States, knowing the condensate in question to have been stolen from PEP in Mexico.

87.   Each knowing transport of stolen PEP condensate in interstate or foreign commerce in connection with the RICO Defendants' RICO Scheme constitutes a separate and distinct violation of 18 U.S.C. § 2314, and therefore each such transport constitutes a predicate act of "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B).

88.   Also among the acts that were part of and in furtherance of the RICO Defendants' RICO Scheme were the following examples of knowing receipts and/or sales of natural gas condensate stolen by the RICO Defendants' co-conspirators in Mexico:

A.   On or about January 26, 2009, Defendants USPD, Dappen, Maldonado, Brink, and Crescenzi, non-defendant co-conspirators Petro Salum, Y Oil and Gas, and Continental Fuels, and their co-conspirators arranged for a total of ten trucks of stolen PEP condensate with a value in excess of $5,000 to be sold to Continental Fuels and delivered to

USPD's terminal within the Port of Brownsville, Texas, knowing the condensate in question to have been stolen from PEP in Mexico;

B.      On or about February 7, 2009, Defendants USPD, Brink, Crescenzi, Trammo Petroleum, and Schroeder, non-defendant co-conspirator Continental Fuels, and their co-conspirators arranged for a barge of stolen PEP condensate with a value in excess of $5,000 to be loaded at USPD's terminal within the Port of Brownsville, Texas, knowing the condensate in question to have been stolen from PEP in Mexico;

C.      On or about February 19, 2009, Defendants USPD, Valley Fuels, and Pechenik, non-defendant co-conspirator Continental Fuels, and their co-conspirators arranged for a total of two trucks of stolen PEP condensate with a value in excess of $5,000 to be sold to Continental Fuels and delivered to USPD's terminal within the Port of Brownsville, Texas, knowing the condensate in question to have been stolen from PEP in Mexico;

D.      On or about February 27, 2009, Defendants USPD, Maldonado, Brink, and Crescenzi, non-defendant co-conspirators Y Oil and Gas and Continental Fuels, and their co-conspirators arranged for a total of six trucks of stolen PEP condensate with a value in excess of $5,000 to be sold to Continental Fuels and delivered to USPD's terminal within the Port of Brownsville, Texas, knowing the condensate in question to have been stolen from PEP in Mexico;

E.      On or about March 3, 2009, Defendants USPD, Dappen, Maldonado, Valley Fuels, Pechenik, Brink, and Crescenzi, non-defendant co-conspirators Importadora Exportadora, Petro Salum, Y Oil and Gas, and Continental Fuels, and their co-conspirators knowingly arranged for at least seven trucks of stolen PEP condensate with a value in excess of $5,000 to be sold to Continental Fuels and delivered to USPD's terminal within the Port of

HUI-127905v1

Brownsville, Texas, knowing the condensate in question to have been stolen from PEP in Mexico;

      F.      On or about December 2008 through March 2009, Defendants Brink and Crescenzi, non-defendant co-conspirator Continental Fuels, and their co-conspirators arranged for the sale of approximately $1 million worth of stolen PEP condensate to Defendant Murphy Energy, knowing the condensate in question to have been stolen from PEP in Mexico;

      G.      On or about December 2008 through March 2009, Defendants Brink, Crescenzi, Trammo Petroleum, and Schroeder, non-defendant co-conspirator Continental Fuels, and their co-conspirators arranged for Continental Fuels and Murphy Energy to sell at least $2.4 million worth of stolen PEP condensate to Defendant Trammo Petroleum, knowing the condensate in question to have been stolen from PEP in Mexico; and

      H.      On or about January-March 2009, Defendants Trammo Petroleum and Schroeder and their co-conspirators knowingly arranged for Defendant Trammo Petroleum's sale of at least $2.4 million worth of stolen PEP condensate to Defendant BASF Corporation, knowing the condensate in question to have been stolen from PEP in Mexico.

      89.      Each knowing receipt or sale of stolen PEP condensate valued at $5,000 or more in connection with the RICO Defendants' RICO Scheme constitutes a separate and distinct violation of 18 U.S.C. § 2315, and therefore each such receipt or sale constitutes a predicate act of "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B).

      90.      Also among the acts that were part of and in furtherance of the RICO Defendants' RICO Scheme were the following examples of financial transactions involving the proceeds of the Conversion Enterprise's unlawful transport, receipt, or sale of PEP condensate stolen by the RICO Defendants' co-conspirators in Mexico. These transactions were conducted by the RICO

Defendants and their co-conspirators with the knowledge that the condensate in question had been stolen from PEP in Mexico, and with the intent to promote the carrying on of such unlawful transport, receipt, or sale of stolen PEP condensate:

      A.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels paid Defendant Maldonado and non-defendant co-conspirator Y Oil and Gas approximately $327,019 by wire for the purchase of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas;

      B.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels paid Defendant Pechenik approximately $5,463 by wire as a commission on Continental Fuels' purchase of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas;

      C.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels paid non-defendant co-conspirator Petro Salum by wire for the purchase of at least seventeen tanker trucks of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas; and

      D.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels paid Defendant Dappen approximately $69,000 by wire as a commission on Continental Fuels's purchase of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas.

      91.     Each intentional and knowing participation in a financial transaction involving the proceeds of the Conversion Enterprise's unlawful transport, receipt, or sale of stolen PEP condensate in connection with the RICO Defendants' RICO Scheme constitutes a separate and

distinct violation of 18 U.S.C. § 1956(a)(1), and therefore each such transaction constitutes a predicate act of "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B).

92.     Also among the acts that were part of and in furtherance of the RICO Defendants' RICO Scheme were the following examples of transports, transmittals, or transfers of monetary instruments or funds from the United States to Mexico with the intent to promote the carrying on of the Conversion Enterprise's unlawful transport, receipt, or sale of PEP condensate stolen by the RICO Defendants' co-conspirators in Mexico.  These transports, transmittals, or transfers were conducted by the RICO Defendants and their co-conspirators with the knowledge that the condensate in question had been stolen from PEP in Mexico:

A.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels wired to one or more bank accounts in Mexico approximately $668,000 for the purchase of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas; and

B.     On or about January-March 2009, non-defendant co-conspirator Continental Fuels paid non-defendant co-conspirator Importadora Exportadora approximately $284,269 by wire from the United States to Mexico for the purchase of stolen PEP condensate delivered to USPD's terminal in the Port of Brownsville, Texas.

93.     Each intentional and knowing transport, transmittal, or transfer of monetary instruments or funds from the United States to Mexico with the intent to promote the carrying on of the Conversion Enterprises's unlawful transport, receipt or sale of stolen PEP condensate in connection with the RICO Defendants' RICO Scheme constitutes a separate and distinct violation of 18 U.S.C. § 1956(a)(2), and therefore each such transport, transmittal, or transfer constitutes a predicate act of "racketeering activity" pursuant to 18 U.S.C. § 1961(1)(B).

- 26 -

### (2)   RICO Defendants' conduct constitutes a pattern of racketeering activity

94.     The predicate acts of racketeering described above constitute a pattern of racketeering activity.  They had the same or similar unlawful purposes, results, participants, and victim, and were not isolated events.  The common purpose of these multiple racketeering acts was to steal PEP condensate, transport it into the United States, and sell it for profit to end users.  These racketeering acts were carried out by the RICO Defendants and their co-conspirators to the detriment of PEP and for the benefit of the RICO Defendants and their co-conspirators.

95.     The RICO Defendants' and their co-conspirators' repeated and continuous acts of racketeering were neither isolated nor sporadic events.  Rather, they were a calculated series of repeated violations of law.  The RICO Defendants' and their co-conspirators' repeated violations of law did not constitute a scheme of limited duration, but rather would have continued indefinitely if U.S. law enforcement agencies did not intervene and PEP did not take action.  Moreover, the RICO Defendants' actions constitute a pattern of racketeering activity because they were part of the Defendants' and their co-conspirators' regular way of conducting business.  This is evidenced by the fact that the RICO Defendants and their co-conspirators have stolen millions of dollars worth of natural gas condensate from PEP's Burgos Field in northern Mexico and brought it into the United States—which, as explained in detail above, is the only market for stolen PEP condensate.

### N.   Injuries Sustained by PEP by Reason of the RICO Defendants' and Their Co-conspirators' Activity

96.     As a direct and proximate result of the RICO Defendants' criminal racketeering activity and other illegal conduct in furtherance of their conspiracy, PEP has suffered substantial injuries as a result of having millions of dollars worth of condensate stolen to fuel a black market in the United States.

- 27 -

## V.    CAUSES OF ACTION

### Count 1:  Civil RICO Liability
### (For Violation Of Section 1962(c) Of The Racketeer Influenced And Corrupt Practices Act (RICO) Provisions Of The Organized Crime Control Act Of 1970, As Amended, 18 U.S.C. §§ 1961-68, Against The RICO Defendants)

97.    Plaintiff incorporates by reference and re-alleges ¶¶ 1-96 as if fully stated herein.

98.    At all relevant times, the RICO Defendants were each "persons" within the meaning of 18 U.S.C. §§ 1961(3).

99.    At all relevant times, the RICO Defendants and their co-conspirators formed the "Conversion Enterprise."

100.    At all relevant times, the RICO Defendants were "persons . . . associated with" the Conversion Enterprise within the meaning of 18 U.S.C. § 1962(c).

101.    At all times, the Conversion Enterprise was engaged in, and its activities affected, interstate commerce.

102.    At all relevant times, in furtherance and for the purpose of executing the described scheme, the RICO Defendants, acting personally or through their agents, conducted the affairs of the Condensate Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). The purpose of the RICO Defendants' racketeering activity was to conduct the affairs of the Condensate Enterprise, through the performance of their unique and essential functions under the scheme, for the purpose of transporting the stolen PEP condensate into the United States and selling it for profit to third parties in the United States. The RICO Defendants also engaged in unlawful financial transactions involving the proceeds from the transport and sale of stolen PEP condensate with the intent to promote the carrying on of such unlawful activity.

- 28 -

103.     The racketeering activity, consisting of predicate acts found in 18 U.S.C.
§ 1961(1), included repeated acts of knowingly transporting stolen PEP condensate across the
Mexico/U.S. border in violation of 18 U.S.C. § 2314; receiving and selling stolen PEP
condensate in the United States in violation of 18 U.S.C. § 2315; conducting financial
transactions with the proceeds of such unlawful transport, receipt, or sale of stolen PEP
condensate in violation of 18 U.S.C. § 1956(a)(1); and transmitting or transferring from the
United States into Mexico the proceeds of such unlawful transport, receipt, or sale of stolen PEP
condensate in violation of 18 U.S.C. § 1956(a)(2).  Each (A) transport, receipt or sale of stolen
PEP condensate, (B) transaction involving the proceeds of such illegal transport, receipt or sale,
and (C) transport, transmittal, or transfer from the United States into Mexico of funds with the
intent to promote such unlawful transport, receipt or sale, constituted a separate violation of the
law.

104.     Some of the specific acts constituting the pattern of racketeering activity are
detailed in this complaint in ¶¶ 86-93 and ¶¶ 110-12.

105.     As a direct and proximate result of the RICO Defendants' conduct in violation of
18 U.S.C. § 1962(c), PEP has been injured in its business and property.  PEP has suffered
substantial monetary losses and will continue to incur costs, expenses and legal fees as a result of
these RICO Defendants' and their co-conspirators' unlawful acts.  PEP is, therefore, entitled to
recover threefold the damages it has sustained, together with the costs of the suit, including
reasonable attorneys' fees and experts' fees.  Moreover, each of the entity RICO Defendants
Valley Fuels, Trammo Petroleum, and USPD is separately liable for the injuries suffered by PEP
under the doctrine of respondeat superior for the actions of its employees.

- 29 -

**Count 2:  Civil RICO Liability**
**(For Violation Of Section 1962(d) Of The Racketeer Influenced And Corrupt**
**Practices Act (RICO) Provisions Of The Organized Crime Control Act Of 1970,**
**As Amended, 18 U.S.C. §§ 1961-68, Against The RICO Defendants)**

106.   Plaintiff incorporates by reference and re-alleges ¶¶ 1-105 as if fully stated herein.

107.   At all relevant times, the RICO Defendants were each persons within the meaning of 18 U.S.C. § 1961(3).

108.   At all times, the Conversion Enterprise was engaged in, and its activities affected, interstate commerce.

109.   The RICO Defendants and their co-conspirators entered into an agreement to and did thereafter conspire to violate 18 U.S.C. § 1962(c).

110.   The object of the conspiracy was to violate 18 U.S.C. § 1962(c) by profiting at PEP's expense through a pattern of racketeering activity.  Specifically, the RICO Defendants and their co-conspirators conspired to conduct the activities of the Conversion Enterprise through a pattern of racketeering activity, and to engage in predicate acts of racketeering, including (A) the unlawful transport, receipt, and sale of stolen PEP condensate, (B) the conducting of financial transactions involving the proceeds of such illegal transport, receipt, and sale, and (C) the transport, transmittal, or transfer of funds from the United States to Mexico with the intent to promote such unlawful transport, receipt, and sale of stolen PEP condensate.

111.   The RICO Defendants and their co-conspirators undertook numerous acts in furtherance of the conspiracy.  The RICO Defendants and their co-conspirators stole condensate from PEP's Burgos Field in northern Mexico, transported the stolen condensate across the Mexico/U.S. border and into the United States, and sold the condensate for a profit to end users.  With the intent to promote the unlawful transport, receipt, and sale of stolen PEP condensate, the RICO Defendants and their co-conspirators conducted financial transactions involving the

- 30 -

proceeds of such unlawful transport, receipt, and sale, and they transported, transmitted, or transferred funds from the United States to Mexico.

112. The RICO Defendants and their co-conspirators further agreed to commit predicate acts knowing that the predicate acts were part of a pattern of racketeering activity. The RICO Defendants agreed to commit, did commit, or aided and abetted the commission of repeated acts of: knowingly transporting stolen PEP condensate across the Mexico/U.S. border in violation of 18 U.S.C. § 2314; receiving and selling stolen PEP condensate in the United States in violation of 18 U.S.C. § 2315; conducting financial transactions with the proceeds of such unlawful transport, receipt, or sale of stolen PEP condensate in violation of 18 U.S.C. § 1956(a)(1); and transporting, transmitting, or transferring from the United States into Mexico the proceeds of such unlawful transport, receipt, or sale of stolen PEP condensate in violation of 18 U.S.C. § 1956(a)(2).

113. As a direct and proximate result of the RICO Defendants' conduct in violation of 18 U.S.C. § 1961(d), PEP has been injured in its business and property and has suffered substantial monetary losses. PEP is therefore entitled to recover threefold the damages it has sustained, together with the cost of the suit, including reasonable attorneys' fees and experts' fees. Moreover, each of the entity RICO Defendants Valley Fuels, Trammo Petroleum, and USPD is separately liable for the injuries suffered by PEP under the doctrine of respondeat superior for the actions of its employees.

### Count 3: Conversion
### (Against All Defendants)

114. Plaintiff incorporates by reference and re-alleges ¶¶ 1-113 as if fully stated herein.

115. As set forth above, Defendants imported, purchased, sold, and/or transported natural gas condensate stolen from PEP in Mexico.

- 31 -

116.    This property is the sole and exclusive property of PEP.  PEP has an exclusive right to possession and sale of such property, which is valuable to PEP and vital to its business operations.

117.    PEP at no time consented, expressly or impliedly, to Defendants' purchase, sale, transport, or other exercise of dominion or control over natural gas condensate stolen from PEP in Mexico.

118.    Defendants' improper assumption and exercise of dominion and control over PEP's property has and will continue to interfere with and diminish PEP's rights in that property.

119.    Allowing Defendants to retain the benefits received as a result of their wrongful acts would unjustly benefit Defendants at PEP's expense.

120.    As a direct and proximate result of the Defendants' actions, PEP has been injured, and will continue to be injured, in its business and property in that it has lost, and will continue to lose, the value of the stolen and converted PEP condensate.  PEP is, therefore, entitled to recover the damages it has sustained in the amount of the value of the property converted, with interest, and other damages in an amount to be proven at trial, including costs, reasonable attorneys' fees and experts' fees, and exemplary damages as allowed by law and equity.

### Count 4:  Civil Conspiracy Under Texas Common Law
### (Against The RICO Defendants)

121.    Plaintiff incorporates by reference and re-alleges ¶¶ 1-120 as if fully stated herein.

122.    The RICO Defendants conspired to accomplish unlawful purposes in relation to natural gas condensate stolen from PEP as more fully described above.  The RICO Defendants had the objective of committing common law conversion of PEP's natural gas condensate.  The RICO Defendants had a meeting of the minds on those objectives, committed unlawful, overt acts in furtherance of their objectives and proximately caused PEP to suffer damages as a result.

- 32 -

123.   As a direct and proximate result of the RICO Defendants' civil conspiracy, PEP has been injured, and will continue to be injured, in its business and property.  PEP is, therefore, entitled to recover from the RICO Defendants, jointly and severally as applicable, the damages PEP has sustained in an amount to be proven at trial, including costs, reasonable attorneys' fees and experts' fees, and exemplary damages as allowed by law and equity.  Moreover, each of the entity RICO Defendants Valley Fuels, Trammo Petroleum, and USPD is separately liable for the injuries suffered by PEP under the doctrine of respondeat superior for the actions of its employees.

### Count 5:  Equitable Claims/Remedies
### (Unjust Enrichment/Constructive Trust/Money Had and Received)
### (Against All Defendants)

124.   Plaintiff incorporates by reference and re-alleges ¶¶ 1-123 as if fully stated herein.

125.   Based upon Defendants' wrongful conduct, Plaintiff seeks to recover in equity monies held by Defendants that belong to Plaintiff in equity and good conscience.

126.   As set forth above, Defendants purchased, sold, transported, refined, and/or otherwise used for their respective benefit, natural gas stolen from PEP and over which PEP had an exclusive right to possession and sale.

127.   Most, if not all, Defendants did so with the knowledge that the condensate in question was stolen PEP property.

128.   As a result of their purchase, sale, transport, refining, and/or other use of PEP's stolen property, the Defendants received and hold money that in equity and good conscience belongs to PEP.

129.   Allowing Defendants to retain the benefits received as a result of their acts would unjustly benefit Defendants at PEP's expense.

- 33 -

130.    Plaintiff seeks imposition of a constructive trust in order to maintain and remit to Plaintiff the monies improperly collected by and maintained by Defendants through their wrongful trade in stolen PEP condensate.  At all times mentioned herein, monies belonging to Plaintiff were in the possession and under the control of Defendants.  Defendants have taken this property for their own use and benefit, thereby depriving Plaintiff of the use and benefit thereof.  Plaintiff has been damaged by its failure to receive these funds.  By virtue of their wrongful actions, Defendants hold these funds as constructive trustees for the benefit of Plaintiff.

131.    In the alternative to Plaintiff's claim for conversion, Plaintiff pleads the equitable claim of money had and received.  At all times mentioned herein, Defendants held monies that in equity and good conscience belonged to Plaintiff.  By virtue of the fact that Defendants collected these monies as a result of their purchase, sale, transport, or other use of condensate stolen from PEP, these funds rightfully belong to Plaintiff.

132.    Plaintiff seeks these equitable remedies to prevent the unjust enrichment of Defendants by causing payment to Plaintiff of all amounts wrongfully obtained by and maintained in the possession of Defendants in addition to interest, including costs, reasonable attorneys' fees and experts' fees, and exemplary damages as allowed by law and equity.

## VI.   JURY TRIAL DEMAND

133.    Plaintiff, by counsel and pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands a trial by jury in this action.

## VII.   ATTORNEYS' FEES

134.    Plaintiff seeks attorneys' fees from the Defendants under 18 U.S.C. § 1964(c) and any other applicable law.

- 34 -

## VIII.   EXEMPLARY DAMAGES

135.   At the time of their respective imports, purchases, sales, and or transports of natural gas condensate, Defendants Jonathan Dappen, Valley Fuels, Stephen Pechenik, Arnoldo Maldonado, Timothy Brink, Joshua Crescenzi, USPD, Trammo Petroleum, and Donald Schroeder did so with malice, i.e., willfully, intentionally, and with the knowledge that the condensate over which they were exercising dominion and control was stolen PEP property to which Defendants had no legal right.

136.   Accordingly, Plaintiff requests exemplary damages against these particular Defendants under the Texas Civil Practice and Remedies Code § 41.003 and any other applicable law.

137.   Plaintiff also requests treble damages against the RICO Defendants under 18 U.S.C. § 1964(c).

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following:

A.   For judgment in favor of Plaintiff and against Defendants for: (i) violation of the RICO statute, 18 U.S.C. § 1962(c); (ii) violation of the RICO statute, 18 U.S.C. § 1962(d); (iii) conversion; (iv) civil conspiracy; and (v) unjust enrichment/constructive trust/money had and received;

B.   An award to Plaintiff of full damages, inclusive of all compensatory damages, restitution and disgorgement, exemplary damages, treble damages under RICO, pre- and post-judgment interest and reasonable attorneys' fees and costs; and

C.   For an Order awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: June 7, 2010

Respectfully submitted,

/s/ James S. Teater
**James S. Teater**
Attorney-in-Charge
Texas State Bar No. 19757425
Southern District of Texas No. 14851
jsteater@jonesday.com

OF COUNSEL:

JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002-2712
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

**Emmanuel Ubiñas**
Texas Bar No. 24037622
eeubinas@jonesday.com
(application for admission submitted)

JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201-1515
Telephone:  214-220-3939
Facsimile:  214-969-5100

**Kevin F. Feeney**
Texas Bar No. 24065222
kffeeney@jonesday.com
(application for admission submitted)

JONES DAY
717 Texas, Suite 3300
Houston, Texas  77002-2712
Telephone:  (832) 239-3939
Facsimile:  (832) 239-3600

**ATTORNEYS FOR PLAINTIFF
PEMEX EXPLORACIÓN Y
PRODUCCIÓN**

HUI-127905v1